[Cite as *State v. Jackson*, 2026-Ohio-2528.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30558 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 CR 03669 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| SHAWN ADRIAN JACKSON SR. | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on July 2, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and EPLEY, J., concur.

MONTGOMERY C.A. No. 30558

CHRISTOPHER BAZELEY, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee

LEWIS, P.J.

{¶ 1} Defendant-appellant Shawn Adrian Jackson Sr. appeals from his convictions in the Montgomery County Common Pleas Court of murder and related offenses. For the following reasons, we affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} On December 18, 2023, Jackson was indicted by a Montgomery County grand jury on six counts of murder, four counts of felonious assault, two counts of aggravated robbery, two counts of aggravated burglary, and one count of having a weapon while under disability ("A Indictment"). All the counts had an accompanying firearm specification, except for the charge of having a weapon while under disability. The charges arose from the shooting death of D.B. and the shooting of S.S. at 717 Brooklyn Avenue in Dayton on December 6, 2023.

{¶ 3} On March 5, 2024, a second indictment was issued in the same case for one count of possession of cocaine (100 grams) in violation of R.C. 2925.11(A), a first-degree felony with a major drug offender specification ("B Indictment"). This offense related to the execution of a search warrant at 1908 Palisades Drive in Harrison Township on December 8, 2023.

{¶ 4} On June 18, 2025, Jackson filed a motion to sever the A Indictment from the B Indictment for trial. The trial court overruled Jackson's motion.

{¶ 5} Jackson filed a jury waiver solely for the charge of having a weapon while under disability, which was tried to the bench following the jury trial. The following is a summary of the evidence presented to the jury.

{¶ 6} In December 2023, S.S. was dating D.B., whom she had known for three years. D.B. went by the nickname "Butter." D.B. and S.S. had their own cell phones; D.B. did not have a landline phone. D.B. lived alone at 717 Brooklyn Avenue, but S.S. frequently visited him. D.B.'s house was a single-story residential home with a basement. The home had two entrances, a front door and a back door. From the front door, one entered the living room and proceeded to the dining room and then the kitchen, where the back door was located. The basement door was located near the back door. A hallway to the right of the dining room led to two bedrooms and a bathroom. The front bedroom was a spare bedroom, the rear bedroom was the master bedroom, and a bathroom was situated between the two bedrooms. D.B. had a pitbull, which was kept in a cage in the kitchen.

{¶ 7} D.B. made a living selling drugs and had a home DVR surveillance system with cameras outside his front and back doors. Televisions in the living room and the master bedroom displayed the surveillance video in real time. S.S. did not have access to the DVR system, which required a passcode. D.B. kept drugs in the master bedroom, but S.S. did not know what kind of drugs they were except that they were white. S.S. had been in the house when D.B. sold drugs, and people usually entered and exited through the front door rather than the back door.

{¶ 8} On the evening of December 6, 2023, S.S. was at D.B.'s house with him. S.S. heard D.B. talking on his phone while they were in the master bedroom. While still on the phone, D.B. got up, walked toward the front door, and told someone to come inside. S.S. remained on the bed in the master bedroom. S.S. heard the front door close and looked at

3

the surveillance video for the front of the house, which showed a black car parked in the street. D.B. returned to the bedroom with a black male. S.S. did not know the name of the man but heard D.B. call him "Cuz." She had not seen the man at D.B.'s house before. D.B. grabbed something from the bedroom and told the man to go back into the living room. When D.B. walked back into the living room, S.S. heard a single gunshot.

{¶ 9} S.S. got out of bed, but the black male came into the bedroom and tried to push her back onto the bed. S.S. escaped into the dining room, where she saw D.B. face down on the floor. D.B. was lying on the floor near the doorway that led to the kitchen from the dining room. D.B. was neither moving nor talking, and she never saw him move again. The man accosted S.S. in the dining room, grabbed her, and put a gun to her head. The man told her to turn around and put her face on the ground. S.S. refused to comply because she did not want him to shoot her in the back of her head. S.S. pleaded with the man not to shoot her and eventually sat with her legs "criss-cross applesauce" on the dining room floor across the room from D.B. S.S. and the man stared at each other. S.S. took her eyes off the man, and he shot her. When S.S. was struck by the gunfire, she felt her teeth crushing and she could not see anything. S.S. remained sitting on the floor with her legs crossed and her head down. When S.S. opened her eyes and could see again, she noticed that her lap was full of blood. S.S. played dead by leaving her head down with one eye open and not breathing or moving because the shooter was still inside the house. S.S. was unaware how many times she had been shot, but she later discovered she had seven separate holes that were later stitched closed. There were two holes on each of her arms and multiple holes in her head and face. At least one of the holes was an exit wound where a bullet came out of her chin.

{¶ 10} While S.S. played dead, she heard the shooter go into the master bedroom, and she also saw his feet moving around her. Once S.S. heard the front door close, she got up, locked the front door, and called the police from her cell phone, which she had left in the master bedroom. The shooter never asked for anything, and S.S. did not see him carry anything out of the bedroom.

{¶ 11} S.S. made her 911 call at 7:44 p.m. She was able to ambulate, and she knew that she was injured in her mouth, which was bleeding. But she did not feel pain. S.S. cried on the 911 call because she was scared. She was unable to speak clearly because of a hole in the top of her mouth. S.S. stood over D.B. while she was on the phone, and then she went to the living room and waited on her hands and knees until police arrived. S.S. also called her sister L.J. at 7:44 p.m. and 7:47 p.m. to tell her that she was shot at D.B.'s house. Other than the shooter, S.S. did not recall anyone else coming to D.B.'s house that day. No one entered or exited D.B.'s house from the time the shooter left at 7:43 p.m. to the time the police arrived at 7:48 p.m.

{¶ 12} Watching the live surveillance video, S.S. saw the police arrive, and she let them inside the house. S.S. did not recall if she had locked the back door, but it was locked when police checked it. The officers cleared the home, and no one else was found inside the house. Although S.S. was ambulatory, it was difficult for officers and medics to communicate with her because of the multiple gunshot wounds to her forearms and head, including a gunshot wound to her mouth. S.S.'s face was swollen, she had a gunshot wound in her forehead, there was pressure forcing one of her eyes out, and she was covered in blood. Despite S.S.'s difficulty orally communicating, she was oriented to person, place, time, and event. She was transported to Miami Valley Hospital, where she underwent

5

several surgeries to repair her face. Small bullet fragments were collected from S.S.'s body.

{¶ 13} D.B. was declared deceased at 7:55 p.m. on December 6, 2023. He died from a single gunshot wound to the back of the head. The coroner recovered a projectile fragment from D.B.'s posterior scalp and the remainder of the projectile from D.B.'s neck muscles. The gun's distance from the entrance wound when it was fired was indeterminate, but it was not a contact wound. D.B.'s wallet was found in his pants pocket, which contained over $400 cash.

{¶ 14} There were no signs of forced entry into D.B.'s home. Inside the house, blood droplets were seen in all but the front bedroom, and there was an area of coagulated blood by D.B.'s head. A television in the living room was turned on, displaying surveillance video from the front and rear exterior doors of the home. Another screen in the master bedroom displayed the same surveillance video. Although the officers attempted to review the DVR footage at the house, they were unable to access it because it was passcode protected. The entire DVR surveillance system was collected and sent to Montgomery County Sheriff's Office Detective Isaiah Keller to extract the video from the DVR. Detective Keller was able to bypass the passcode to access the videos. Recordings from the DVR were transferred to a flash drive and submitted at trial.

{¶ 15} Officers observed a digital scale on the table in the dining room, as well as a white, powdery residue inside the lid of a scale. On the kitchen counter, there was an open box of sandwich bags and two sandwich bags tied with knots. The tied-off bags contained a chunky, white substance that appeared to be cocaine. Later testing confirmed that the two bags of drugs recovered from D.B.'s kitchen contained cocaine with a combined weight

of just under 15 grams. A bag containing suspected marijuana was found inside a pair of shoes near D.B.'s body.

{¶ 16} Despite S.S. having been shot multiple times and D.B. having been shot once, only two casings were found in the house. It was believed that additional casings were missing from the scene and that they could have been accidentally moved by the responding officers or medics, or they could have been intentionally removed by the shooter. Two spent 9 mm MXT 9x19 cartridge casings were recovered, each with a "21" imprint stamped on the head of casing; one was recovered from the kitchen, and the other was recovered from the corner of the dining room where S.S. had been shot. A spent projectile was recovered from the HVAC register on the floor of the dining room, near where S.S. had been shot. Several rounds of ammunition and magazines were recovered from the two bedrooms, but no firearms were recovered from the home.

{¶ 17} Officers attempted to obtain Ring camera footage from the house across the street from the shooting, but the video was very dark and not helpful. A car and a person could be seen in the street, but no details could be discerned about either the vehicle or the person.

{¶ 18} Detectives did not locate D.B.'s cell phone in his house or on his person. Detectives obtained D.B.'s phone number and contacted Verizon for an exigent circumstances ping of the phone to locate it. They also requested call details and location information for the phone for the prior 48 hours. The records obtained through this request reflected that the last call activity on D.B.'s cell phone was an incoming call from a 614 area code at 7:36 p.m. on December 6, 2023, about 8 minutes prior to the 911 call. The 614 phone number was registered to Jackson. D.B.'s cell phone had also received calls from Jackson's number a few times earlier that evening. The detectives obtained Jackson's

7

social security number, date of birth, and address. Jackson was 48 years old at the time of the shooting.

{¶ 19} Dayton Police Homicide Detective Zach Williams, who had responded to the original December 6, 2023 call out, was assigned as the case detective. After receiving D.B.'s cell phone records, Detective Williams called the 614 phone number and spoke with Jackson on December 7, 2023, at 12:41 a.m. Once Jackson was informed by Detective Williams that the detective was investigating a homicide and Jackson was the last number to call D.B., Jackson said that he had been in contact with D.B. to purchase some marijuana. Jackson claimed he did not meet with D.B. and had obtained his marijuana from someone else. Jackson declined to provide his vehicle information to the detectives.

{¶ 20} When S.S awoke in the hospital from the more-than-seven-hour surgery she underwent immediately after her arrival at the hospital, her mouth was wired shut and she had bandages on her head and arms. Two of her sisters were at the hospital, and she communicated with them by writing on paper because she was unable to talk. S.S. described the person that shot her and D.B., writing that the shooter had a black truck-type car and had called D.B. on the phone when he was in front of the house. S.S. indicated that D.B. opened the door, let the guy in, and called him "Cuz." S.S. described the shooter as an older black male and "ugly." He wore glasses and had his head covered. Because the shooter had smiled at her, S.S. saw that he had gold teeth. She described the series of events in the house and expressed that she thought she was going to die.

{¶ 21} S.S. used her sister L.J.'s phone to contact D.B.'s friends and provide them with a description of the shooter. Based on the description that S.S. provided, four Facebook pictures were sent to L.J.'s phone. S.S. reviewed the pictures and frantically beat on the notepad when she recognized the person in the fourth photo as the shooter.

8

S.S. immediately wrote, "That's him.   That's the guy that killed Butter and shot me."   The Facebook picture depicted Jackson and identified his full name.   S.S. did not know Jackson prior to the shooting and learned his name from seeing the Facebook picture.   S.S. positively identified Jackson in open court as the man who shot her.

{¶ 22} In the early morning hours of December 8, 2023, L.J. contacted Detectives Williams and David House.   She updated them on the information she had learned from S.S. about the shooting.   L.J. forwarded the detectives photographs of S.S.'s handwritten notes and the Facebook photograph of Jackson.   L.J. forwarded Detective House a second photograph of Jackson, which she had found on Facebook.   The photograph showed Jackson wearing glasses, gold teeth, and a black head covering, which S.S. identified as how Jackson appeared when he shot her.

{¶ 23} After learning of S.S.'s identification of Jackson, the detectives searched databases for any active motor vehicle registrations connected to Jackson.   A black 2016 Nissan Altima was registered in Jackson's name.   The certificate of registration for the car was put in Jackson's name on August 3, 2023.   Detective House entered the Altima's information into Flock, a series of traffic cameras that record vehicle license plates and the make, model, and color of vehicles that drive by the cameras.   Detective House located a Flock photograph of the Altima from November 19, 2023, at 4:26 p.m.   A second Flock photograph of the Altima was also found.   Taken on December 6, 2023, the image showed the Altima driving northbound on Philadelphia Avenue near Siebenthaler Avenue at 7:50 p.m., which was shortly after the homicide.

{¶ 24} On the morning of December 8, 2023, Detective Keller provided the detectives a portion of the downloaded video from D.B.'s DVR system.   The video showed a black four-door vehicle arrive at D.B.'s house and a single black male coming and going from the

9

residence at the time of the homicide. The characteristics of the vehicle that arrived at D.B.'s house just before the shooting were consistent with the characteristics of Jackson's Nissan Altima, including the metallic rims, wheel spokes, taillights, color, location of the license plate, and general overall appearance. The vehicle pulled up at 7:35 p.m. and parked on the street outside D.B.'s house. The driver stayed in the vehicle for approximately a minute and a half, which was consistent with the time at which D.B. received the 7:36 p.m. phone call from Jackson. The man then walked up to the front door wearing black pants and a distinctive red, black, and white jacket with white stripes on the left cuff, red stripes on the right cuff, and red markings on the back. He also wore black shoes with a piece of silver on the shoelaces, glasses, metallic teeth, and a black head covering. At 7:37 p.m., the man opened the front door to D.B.'s home and walked inside.

{¶ 25} Detective House took screen grabs from the surveillance video to focus on the man's vehicle, his glasses, coat, and shoes. Between the time that the man walked out of D.B.'s house at 7:43 p.m. and the time that police arrived at 7:48 p.m., no one else entered or exited D.B.'s front door. Likewise, no one entered or exited the back door during the recorded time before and after the homicide until one of the officers opened the back door from the inside when the police were clearing the home.

{¶ 26} Detective Williams put out a broadcast to law enforcement that they were looking for Jackson and Jackson's Altima. Shortly thereafter, a Montgomery County deputy sheriff located the Altima in a parking lot at the rear of 1908 Palisades Drive in Harrison Township, which is just north of the city limits of Dayton. Sheriff's deputies remained on scene and conducted surveillance while Dayton Police homicide detectives responded to the location. Officers used a PA system on a marked police cruiser to order the occupants of the residence outside. Within a few minutes, Jackson and his girlfriend, Oletha Courtney,

10

came out of the residence and were taken into custody. A black Samsung cell phone was removed from Jackson's pocket, which was later determined to be registered to the 614 phone number that had called D.B. just before he was shot. Officers did a protective sweep of the residence and then sought a search warrant. The sweep occurred at 9:10 a.m. on December 8, 2023. No one else was found inside the apartment.

{¶ 27} Upon obtaining the search warrant, detectives and officers searched the Palisades Drive residence. While searching the master bedroom, located upstairs, officers found a black plastic bag in the corner that contained four small plastic bags hidden inside cotton gloves. The substances inside the bags were later determined to contain cocaine with a combined weight of over 300 grams. A pair of size 12 black Nike Air Force One shoes with a metal clip on the shoestrings were recovered from the same upstairs bedroom. A DMX Ruff Ryders Aaliyah jacket, similar to the one seen in the surveillance video, was found in a downstairs closet at the Palisades Drive residence and collected as evidence. Courtney stated the black Nike shoes, the DMX jacket, the Nissan car, and a set of Nissan car keys belonged to Jackson. Neither D.B.'s cell phone nor the murder weapon was ever found.

{¶ 28} Jackson was taken to the Dayton Police Department for an interview, where he was advised of his rights and agreed to speak with detectives. Jackson stated that he called D.B. around 6:00 or 7:00 p.m. on December 6, 2023, to buy some marijuana, but he claimed he never met up with D.B. that day and instead purchased marijuana from someone else. Jackson said that he always kept his phone on him, which he described as his "lifeline." Jackson acknowledged that he had a black Nissan Altima and that he had top and bottom "grills" for his teeth. He further acknowledged that he was the man depicted in

11

the Facebook photographs L.J. had sent to the detectives. Jackson claimed that he had known D.B. for a couple of years and had previously been to D.B.'s house.

{¶ 29} Jackson denied using any drugs and refused to discuss the drugs found at his apartment. D.B. denied being the person on the surveillance video and denied killing D.B. or "doing anything to his girl." Jackson further stated that he did not know where D.B.'s phone was located. Following his interview, Jackson was taken to jail and charged with murder.

{¶ 30} After the shooting, S.S. remained in the hospital for about a week. When S.S. was discharged, she was given pain medication. She was too scared to return to her apartment and stayed with her sister. She was unable to eat normally because her jaw was wired shut. At the time of trial S.S., still had scars from her gunshot wounds. S.S. was missing teeth for about 18 months, which she had fixed just before trial. S.S. had nerve damage in her eye and her palate was gone. S.S. denied being under the influence of drugs or alcohol when she was shot. She did not know the difference between a revolver and a semi-automatic firearm but did know that the shooter used a handgun. S.S. was 25 years old at the time of trial.

{¶ 31} Oletha Courtney testified that she lived at 1908 Palisades Drive in December 2023. At that time, she had been dating Jackson for about five to six months, and he was living with her. On December 6, 2023, Courtney had been sick and stayed home most of the day. Courtney recalled that Jackson left the house that evening for about 15 minutes. But she did not see where he went, and she did not go with him. She did not notice anything unusual about Jackson when he returned. In the early morning hours of December 7, 2023, Courtney heard Jackson's cell phone ringing while he was asleep. Jackson answered his

phone and spoke to someone. On December 8, 2023, police came to Courtney's apartment and ordered them outside. She and Jackson walked out of the apartment together.

{¶ 32} Forensic analysis established that the two 9 mm MXT 9x19 cartridge casings recovered from D.B.'s house were fired from the same firearm. The fired bullet, bullet jacket fragment, and metal fragments recovered from D.B.'s neck and the fired bullet recovered from inside the vent in the dining room were fired from the same firearm. The fired bullet and fragments recovered from D.B.'s body and the fired bullet from inside the vent were .38 caliber-class bullets consistent with those loaded in 9 mm cartridges. The bullet jacket fragment recovered from D.B.'s scalp had class characteristics similar to the others, but the comparison was inconclusive due to the damage and missing pieces. The four metal fragments recovered from S.S.'s body were too small, and as a result, they were unable to be compared due to insufficient class and individual characteristics. The fired bullets and spent cartridge casings were fired by a similar caliber firearm, but without having a firearm to compare them to, the firearms analyst could not say that they were fired from the same firearm.

{¶ 33} The evidence also included the results of DNA samples taken from the four bags of drugs recovered from 1908 Palisades Drive. On the first plastic bag, there was no DNA profile of sufficient quality for comparison due to insufficient data and the number of potential contributors. The DNA profiles obtained from two of the plastic bags were mixtures. The major contributor was consistent with Jackson, and D.B. was excluded as the major contributor. No conclusions could be made regarding the remainder of the DNA mixtures on those two bags. DNA analysis of the fourth plastic bag revealed a mixture with two major DNA contributors. Jackson's DNA was one of the major DNA contributors, and D.B. was excluded as a major contributor. The other major DNA contributor was unknown.

13

The remainder of the DNA mixture on the fourth bag was of insufficient quality for comparison.

{¶ 34} Kevin Horan testified as an expert on cellular phone record analysis and cell site analysis. Horan analyzed phone records from T-Mobile (614 phone number belonging to Jackson) and Verizon (phone number belonging to D.B.). On December 6, 2023, between 7:00 p.m. and 7:40 p.m., D.B.'s phone was at or near 717 Brooklyn Avenue. Between 7:00 p.m. and 7:23 p.m., Jackson's phone was located at or near 1908 Palisades Drive until it started traveling southwest at 7:23 p.m. At 7:36 p.m., Jackson's phone was in the area of 717 Brooklyn Avenue, and it called D.B.'s phone. Immediately thereafter, Jackson was on D.B.'s surveillance video walking up to D.B.'s house.

{¶ 35} At 7:44 p.m., both D.B.'s and Jackson's phones left 717 Brooklyn Avenue and headed north away from D.B.'s house. Between 7:51:19 p.m. to 7:51:34 p.m., only data from D.B.'s phone was observed heading north. Horan was given the 7:50:28 p.m. Flock camera photograph of the intersection of northbound Philadelphia Drive at Siebenthaler Avenue showing Jackson's black Nissan Altima. Horan testified that D.B.'s phone was in the area of that intersection around the time when the Flock photograph was taken.

{¶ 36} Between 7:52 p.m. and 7:59 p.m., both D.B.'s and Jackson's phones moved in a northeasterly direction. Between 8:00 p.m. and 9:00 p.m., both phones were near 1908 Palisades Drive. The last activity on D.B.'s phone occurred at 8:06 p.m., when it was located at or near 1908 Palisades Drive. Horan explained that the lack of records on D.B.'s phone after 8:06 p.m. could mean that the phone was destroyed, powered off, or was no longer able to get service. Jackson's phone continued northbound past 1908 Palisades Drive and then turned around and returned to 1908 Palisades Drive. Between 9:00 p.m. and 11:59 p.m., Jackson's phone remained at 1908 Palisades Drive.

14

{¶ 37} Jackson testified on his own behalf at trial. Jackson denied shooting D.B. or S.S. Jackson had known D.B. for a couple of years prior to the shooting, but Jackson did not know D.B.'s real name and did not know S.S. Jackson and D.B. were friends and had "business arrangements" together in a drug business. Jackson had been to 717 Brooklyn Avenue and had purchased drugs from D.B. in the past.

{¶ 38} On December 6, 2023, Jackson talked to D.B. over the phone about drugs. That evening, Jackson drove in his black Altima to 717 Brooklyn Avenue to purchase drugs and meet D.B.'s associates. Jackson called D.B. when he arrived and then D.B. opened the front door for him to enter. Jackson admitted that it was him in the surveillance video walking up to D.B.'s house wearing his black Air Force One's, DMX jacket, and black jeans. Jackson also wore sterling silver teeth coverings. Jackson denied having a gun on him or in his car. Jackson denied he had any "beef" with D.B. or S.S.

{¶ 39} When Jackson got inside D.B.'s house, the lights in the kitchen and living room were off, but the dining room lights were on. Jackson saw a man sitting on the couch and another man in the kitchen. Jackson did not recognize either of the two men. Jackson never saw anyone in the home with a gun and did not see S.S. in the house.

{¶ 40} D.B. got marijuana out of a cabinet in the kitchen, but Jackson saw cocaine on the dining room table. Jackson put $6,600 in cash on the living room table for D.B.'s associates and took some of the cocaine. Jackson stated he purchased 12 ounces of cocaine at $550 per ounce. Jackson acknowledged that a regular ounce is measured at 28 grams, but on the black market, 24 grams is considered an ounce. Jackson put the cocaine and the marijuana in his jacket and left the house. D.B. walked Jackson to the front door and let him out. Jackson denied turning off the porch light before he walked to his car.

15

{¶ 41} After Jackson drove away, he turned around and drove back up Brooklyn Avenue. Jackson had his own cell phone with him, but he did not have D.B.'s cell phone. Jackson drove to 1908 Palisades Drive, his residence, which was about 10 to 15 minutes away from D.B.'s house. Jackson recalled his exact route—the stop lights he stopped at, the lights that were green, the police cruiser he saw with its lights on while he was on Philadelphia drive, and the amount of traffic around him.

{¶ 42} Jackson's girlfriend, Courtney, was home when he arrived around 8:00 p.m. Jackson then took a neighbor to Miller Lane. Once he was home for the night, Jackson put his DMX jacket in the downstairs closet, took his shoes off in the upstairs bedroom, and went to bed in the clothes he was wearing. Jackson stated that he was "really high" on marijuana but had been okay to drive earlier in the night.

{¶ 43} During the night, Detective Williams called Jackson, but Jackson did not know who called him, despite knowing that the person identified themselves as a Dayton Police detective. Jackson did not want to tell Detective Williams, a stranger, any information. When the detective asked Jackson about D.B. during the phone call, Jackson did not know D.B.'s real name.

{¶ 44} Jackson admitted that the drugs found at 1908 Palisades Avenue belonged to him and that the 614 phone number was his cell phone number in December 2023. Jackson denied lying to the detectives during his interview when he told them that he did not go to D.B.'s house on December 6, 2023. According to Jackson, during the interview, he did not know that the shooting had occurred at D.B.'s house, and he felt that the police were trying to corner him. Jackson admitted he had a prior federal conviction for assault and a prior state conviction for having a weapon while under disability.

16

{¶ 45} Jackson was found guilty as charged by the jury. The State then presented to the court evidence of a 2000 felony drug conviction in support of the charge of having weapons while under a disability. The trial court found Jackson guilty of that count. The court ordered a pre-sentence investigation report and scheduled a sentencing date.

{¶ 46} On July 24, 2025, after merging some offenses, the trial court sentenced Jackson to an aggregate indefinite sentence of a minimum of 40 years to life in prison to a maximum of 45.5 years to life in prison. Jackson timely appealed.

## II. Jackson's Convictions Are Not Against the Manifest Weight of the Evidence

{¶ 47} Jackson's first assignment of error states:

THE WEIGHT OF THE EVIDENCE FAILS TO SHOW THAT JACKSON SHOT

[D.B.] AND [S.S.] OR THAT HE STOLE ANY OF THEIR PROPERTY.

{¶ 48} When reviewing an argument challenging the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 1997-Ohio-52, ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 49} "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility." *State v. Lawson*, 1997 WL

17

476684, *4 (2d Dist.). "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *Id*. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.).

{¶ 50} Jackson argues that his convictions are not supported by the manifest weight of the evidence because the State failed to prove the identity of the shooter beyond a reasonable doubt. Therefore, we limit our analysis in Jackson's first assignment of error to whether Jackson's identification as the shooter is against the manifest weight of the evidence. In support of his position, Jackson points to his own testimony where he stated that he did not shoot D.B. or S.S. Further, he argues that the police framed him for the shooting by fabricating or manipulating the Facebook pictures and S.S.'s handwritten notes.

{¶ 51} Notwithstanding Jackson's initial denials to detectives during his interview, there is no dispute that Jackson is the man seen in D.B.'s surveillance video from December 6, 2023, pulling up to D.B.'s house in his black Nissan Altima and walking into D.B.'s house at 7:37 p.m. There is also no dispute that Jackson is the man in that same surveillance video who is seen walking out of D.B.'s house at 7:43 p.m. and driving off in his Altima. Jackson further admitted that he had obtained a large amount of cocaine from D.B.'s house that night, which was later found at his apartment at 1908 Palisades Drive. The question for the jury was what happened inside D.B.'s house between 7:37 p.m. and 7:43 p.m. on December 6, 2023.

{¶ 52} According to Jackson, D.B. let him in the front door, and he purchased cocaine for $6,600 cash, which he left on a table inside D.B.'s house before walking out. Jackson denied seeing S.S. in the house but claimed he saw two unknown black males, who were

18

D.B.'s "associates." Jackson testified he did not kill D.B., did not shoot S.S., and did not steal anything from D.B.'s home.

{¶ 53} The State's evidence, on the other hand, tells a different story. Jackson's and D.B.'s phone records reflect that Jackson called D.B. at 7:36 p.m., the same time Jackson was parked on the street in front of D.B.'s house in his black Nissan Altima. Jackson acknowledged that he was there to purchase drugs from D.B. S.S. heard D.B. answer the 7:36 p.m. phone call and tell someone to come inside the house. Jackson entered D.B.'s front door at 7:37 p.m. According to S.S., after Jackson entered the home, D.B. and Jackson walked into the master bedroom, where S.S. was located, and D.B. grabbed something in the room. When D.B. and Jackson walked back to the dining room, S.S. heard Jackson shoot and kill D.B. Jackson then chased after S.S., forced her to the ground, and shot her multiple times. Two spent shell casings were recovered from the home; one in the kitchen and one on the dining room floor where S.S. had been shot. Both the spent shell casings were fired from the same gun. Additionally, the fired bullet fragments recovered from D.B.'s body and the fired bullet recovered from inside the vent in the dining room were fired from the same firearm. Although S.S. was shot multiple times, including in the head, she miraculously survived and played dead. She heard Jackson go into the master bedroom and saw him walk around her in the dining room before he fled the house. D.B. kept drugs in the master bedroom, but no drugs were found there when police arrived. A single $20 dollar bill was located on the floor in D.B.'s dining room and just over $400 was found in D.B.'s pocket.

{¶ 54} The surveillance video shows that Jackson left D.B.'s house at 7:43 p.m. S.S. called 911 at 7:44 p.m., informing police that she had been shot. No one else was seen

19

entering or exiting D.B.'s house between D.B.'s departure at 7:43 p.m. and the police's arrival at 7:48 p.m. Besides S.S. and D.B., no one else was inside the house.

{¶ 55} Despite D.B.'s cell phone being at D.B.'s house at 7:36 p.m. when he answered Jackson's phone call, D.B.'s cell phone was never found. However, cell phone records reflect that immediately following D.B.'s death, D.B.'s cell phone moved at the same time and in the same direction of travel as Jackson, Jackson's car, and Jackson's cell phone. Jackson's car was photographed on a Flock camera at the intersection of northbound Philadelphia Drive and Siebenthaler Avenue at 7:50:28 p.m., consistent with the location of D.B.'s cell phone. The last activity from D.B.'s cell phone occurred at 8:06 p.m. on December 6, 2023, at 1908 Palisades Drive.

{¶ 56} After S.S. came out of the surgery she underwent immediately after her arrival at the hospital, she was able to communicate via writing to her sister L.J. about what happened at D.B.'s house. S.S., who was not familiar with Jackson, identified the shooter as an older, black male wearing glasses, a black head covering, and gold teeth. Because D.B. seemed familiar with the shooter when he answered his phone and let the shooter into the house, S.S. reached out via L.J. to D.B.'s close friends with a description of the shooter to see if they recognized him. L.J. received four Facebook photographs on her cell phone from D.B.'s friends. S.S. immediately identified Jackson's photograph as the shooter. This information was forwarded to detectives in the early morning hours of December 8, 2023. Later that same morning, detectives received the surveillance video from D.B.'s house, which showed Jackson entering and exiting D.B.'s house at the time of the shooting. Within 48 hours of the homicide, police located Jackson's vehicle, distinctive clothing that Jackson wore at D.B.'s house, bags of cocaine in Jackson's room, three of which had his DNA on them, and Jackson's 614 cell phone.

20

{¶ 57} There was no evidence presented that the police provided S.S. with Jackson's name or identity to frame Jackson. Nor is there any evidence to corroborate Jackson's claim that two unknown black males were inside D.B.'s house who could have been the shooters, especially considering they were not observed on D.B.'s surveillance video or found by police when they arrived on scene within minutes of the shooting. S.S., who clearly saw the shooter, never stated that there were two other black males inside D.B.'s house at the time of the shooting. Rather, S.S. consistently, and repeatedly, identified Jackson as the shooter. Moreover, Jackson admitted taking a large quantity of cocaine from D.B.'s house, but the purported $6,600 cash he left behind was never found. Nor was D.B.'s phone recovered despite his phone records showing that it left D.B.'s house immediately after the murder and followed Jackson's path of travel to Jackson's apartment. The jury could have reasonably found that Jackson shot D.B. and S.S. and inferred that he stole cocaine and a cell phone from D.B.'s house.

{¶ 58} The overwhelming evidence supported the jury's conclusion that Jackson was the person who shot D.B. and S.S. The jury clearly did not believe Jackson's testimony that he did not shoot D.B. or S.S. In reaching its verdict, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.). We cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Jackson's convictions must be reversed and a new trial ordered. This is not the exceptional case in which the evidence weighs heavily against Jackson's convictions.

{¶ 59} Jackson's first assignment of error is overruled.

### III. The Trial Court Did Not Commit Plain Error in Refusing to Grant Jackson's Motion to Sever Trials

{¶ 60} Jackson's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT OVERRULED JACKSON'S MOTION TO SEVER A TRIAL ON THE POSSESSION OF COCAINE CHARGES FROM THE REMAINING CHARGES.

{¶ 61} Crim.R. 8(A) governs the joinder of offenses in a single indictment. This rule provides that "two or more offenses may be charged in the same indictment" if the offenses are (1) "of the same or similar character;" (2) "based on the same act or transaction;" (3) "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan," or (4) "part of a course of criminal conduct." "Joinder of offenses is favored because it conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 157-58 (1988), citing *State v. Thomas*, 61 Ohio St.2d 223, 225 (1980).

{¶ 62} Even when offenses are properly joined, however, a defendant may seek severance under Crim.R. 14. To prevail on a claim that the trial court erred in denying a motion to sever, the appellant has the burden of affirmatively demonstrating three things: "(1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. A defendant normally cannot establish the requisite prejudice where either (1) the

evidence of each of the crimes joined at trial is simple and direct (the simple-and-direct test), or (2) the State could have introduced evidence of one offense in a separate trial of the other offense had severance been granted (the other-acts test). *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991). "[T]he State can negate a claim of prejudice by satisfying either the other-acts or the simple-and-direct test." *State v. Reed*, Slip Opinion No. 2026-Ohio-1174, ¶ 28.

{¶ 63} Generally, we review a trial court's decision on a Crim.R. 14 motion for an abuse of discretion. *State v. Spaulding*, 2016-Ohio-8126, ¶ 63, citing *State v. Hand*, 2006-Ohio-18, ¶ 166. However, a defendant's failure to renew his or her Crim.R. 14 motion at the close of the State's case or at the conclusion of all the evidence waives all but plain error on appeal. *State v. Elijah*, 2006-Ohio-2635, ¶ 11 (2d Dist.), citing *State v. Strobel*, 51 Ohio App.3d 31, 33 (3d Dist. 1988).

{¶ 64} To establish plain error, a defendant must demonstrate that an error occurred, it was obvious, and it affected the defendant's substantial rights. *Spaulding* at ¶ 64. To have affected the defendant's substantial rights, the defendant must establish that the outcome of the trial would clearly have been different but for the trial court's alleged errors. *State v. Waddell*, 1996-Ohio-100, ¶ 10, citing *State v. Moreland*, 50 Ohio St.3d 58, 63 (1990). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 65} Prior to trial, Jackson filed a motion to sever the drug charge in the B Indictment from the trial on the A Indictment. He argued that the drug charge was based on evidence that was obtained from a different address than the homicide and there was no stated connection between the presence of cocaine at 1908 Palisades Drive and the murder of D.B. at 717 Brooklyn Avenue.

23

{¶ 66} The State responded that the offenses charged were the result of a continuing course of criminal conduct. The State argued that the evidence at trial would show that D.B. sold drugs from his home at 717 Brooklyn Avenue. Following the homicide, small amounts of cocaine and drug trafficking paraphernalia were discovered inside D.B.'s home, but no large quantities of drugs were discovered and D.B.'s phone was missing. The State anticipated that the evidence would demonstrate that Jackson was the last person to call D.B. before the shooting, that the phone call was made to purchase drugs from D.B., that D.B.'s cell phone appeared to travel to 1908 Palisades Drive with Jackson and Jackson's cell phone after the homicide, and a large quantity of cocaine was found at 1908 Palisades Drive. The theory of the State's case was that Jackson stole cocaine from D.B., a potential motive to kill D.B., and stole D.B.'s cell phone to conceal his connection to D.B. The State argued that the drug evidence found at 1908 Palisades Drive was relevant to motive and identity for the charged offenses, particularly the charge of aggravated robbery. Moreover, the State contended that the evidence was simple and direct.

{¶ 67} The trial court denied Jackson's motion to sever, finding that, based on the State's theory of the case, the crimes were connected in a common scheme or plan and/or were part of a continuing course of criminal conduct. The trial court further found that Jackson did not establish prejudice by the joinder of the indictments because the evidence was simple and direct.

{¶ 68} Jackson concedes that he did not renew his motion to sever at any time. Accordingly, the plain error standard set forth in Crim.R. 52(B) governs this court's review of Jackson's motion to sever. We conclude that Jackson has failed to establish any error, let alone plain error, because joinder was proper under Crim.R. 8 and Jackson was not prejudiced by joinder of the offenses.

24

{¶ 69} The crimes of murder, felonious assault, aggravated robbery, and having weapons while under disability occurred on the evening of December 6, 2023, at 717 Brooklyn Avenue. The State proffered that evidence at trial would demonstrate that D.B. sold drugs from his home at 717 Brooklyn Avenue. On December 6, 2023, Jackson called D.B. to purchase drugs and was the last person to contact D.B. before the murder. Jackson and his car are portrayed in surveillance video from D.B.'s house, and Jackson is seen entering D.B.'s house moments before the murder. When police responded shortly after the murder, they recovered only a small amount of cocaine and drug paraphernalia, but neither a large quantity of cocaine nor D.B.'s cell phone was found. Both were items that police had expected to find at D.B.'s house.

{¶ 70} When Jackson left D.B.'s house, he returned to his apartment at 1908 Palisades Drive. Cell phone analysis revealed that D.B.'s phone, which was never recovered, tracked Jackson's flight from D.B.'s house to 1908 Palisades Drive, where the last signal was made from D.B.'s phone. When detectives searched Jackson's apartment on the morning of December 8, 2023, less than 48 hours after the murder, over 300 grams of cocaine was found in the bedroom. Jackson's distinctive clothing items, which were consistent with the clothing observed in D.B.'s surveillance video, were also recovered. Jackson's black Altima, which was seen in D.B.'s surveillance video, was found parked outside Jackson's apartment. DNA evidence collected from the bags of cocaine found in Jackson's apartment connected Jackson to the drugs. We agree with the trial court that the offenses were properly joined under Crim.R. 8(A) because evidence presented in the case showed that they were part of a continuing course of criminal conduct.

{¶ 71} Even if the offenses were properly joined, we must consider whether the evidence was prejudicial. We conclude that the evidence of each crime was simple and

25

direct and, therefore, did not result in prejudice. "In applying the simple-and-direct test, the inquiry is on whether the evidence of each offense is separate and direct, whether the evidence is uncomplicated, and whether the jury is likely to be confused." *Reed*, 2026-Ohio-1174, at ¶ 31. Jackson did not make any argument before the trial court that the evidence was not simple and direct or that the jury would be unable to segregate the evidence involving each offense. Rather, his argument was that the incidents took place at different addresses and that there was "no stated connection" between the cocaine found at Jackson's apartment and the murder of D.B. at 717 Brooklyn Avenue. The State's proffered evidence and the evidence admitted at trial demonstrated that the evidence related to the single drug possession charge was simple, direct, and easily distinguishable from the evidence related to the events at 717 Brooklyn Avenue. Moreover, there is nothing in the record to suggest that the jurors were confused by the evidence or unable to segregate the offenses and evidence related to each charge. *Hamblin*, 37 Ohio St.3d at 159, citing *State v. Roberts*, 62 Ohio St.2d 170 (1980). Accordingly, there is no prejudice.

**{¶ 72}** Jackson's second assignment of error is overruled.

### IV. Trial Counsel was Not Ineffective for Failing to Renew Jackson's Motion to Sever Charges

**{¶ 73}** Jackson's third assignment of error states:

JACKSON'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RENEW HIS MOTION TO SEVER AT THE CONCLUSION OF THE STATE'S CASE IN CHIEF.

**{¶ 74}** We review alleged instances of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *State v. Conway*, 2006-Ohio-2815, ¶ 95. "To reverse a conviction based on ineffective assistance

26

of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different." *State v. Mitchell*, 2008-Ohio-493, ¶ 31 (2d Dist.), citing *Strickland* at 688.

**{¶ 75}** As noted above, Jackson's attorney filed a pretrial motion to have the drug charge tried separately. The trial court overruled the motion, and defense counsel did not renew the request at any time during trial. Jackson argues that his attorney's failure to renew the motion resulted in a waiver of all but plain error and constituted prejudicially deficient performance. We disagree.

**{¶ 76}** As explained more fully in our analysis of Jackson's second assignment of error above, joinder of the offenses for trial was appropriate and severance was not required. The trial court's denial of the pretrial motion for severance was well within its discretion. We see nothing in the record that would have changed the result of the trial or the trial court's ruling on the motion had Jackson's trial counsel renewed the motion to sever at the time of trial. Therefore, Jackson has failed to establish that he received ineffective assistance of trial counsel.

**{¶ 77}** Jackson's third assignment of error is overruled.

## V. Conclusion

**{¶ 78}** Having overruled the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.

27